LARIO, J.T.C.
These three consolidated cases are appeals from denials of farmland assessments for property known as Block 47, Lot 47 in Tewksbury Township for tax years 1985, 1986 and 1987. Interstate 78 Office Park Ltd. appealed the 1985 and 1986 *176 denials; Vanfer Associates, the property’s current owner, appealed the 1987 denial.
The township originally granted farmland assessment for the tax year 1985, however, it subsequently revoked it by placing the property on the added assessment list. The Hunterdon County Board of Taxation affirmed the assessor’s action thereby denying the tax taxpayer's claim for a farmland assessment for 1985. For the tax years 1986 and 1987 taxpayer’s applications for farmland assessments were denied by the assessor. The 1985 tax-year appeal before this court is from the 1985 judgment of the Hunterdon County Board of Taxation and the 1986 and 1987 tax-year appeals are direct appeals. The sole issue presented to this court in each of the years under appeal is whether the subject property is entitled to a farmland assessment; valuation is not in dispute.
The subject property is located at an interchange of Interstate 78 in the township. It consists of approximately 46 acres and contains two houses [one vacant], two barns and approximately one acre of wooded area. Plaintiffs contend that the property is leased to one Laura Osborne [Osborne] and her mother and that Osborne operates thereon a “horse farm;” that the property contains approximately 40 acres of pastureland and five acres in an alfalfa field with the remaining acreage being the land under the farmhouse, buildings and woodlands; and that the two barns located on the premises are used for “raising” horses located on the farm. It further claims that during each year from 1983 through 1987 a minimum of $750 in sales was generated from harvesting the alfalfa field and a minimum of $3,650 of sales was generated from pasturing; that there were sales of horses “raised” at the farm during each of the years 1983 through 1986, which sales in any one year were for a minimum of $3,000.
The township defends claiming that the subject property was not actively devoted to the production for sale of plants and animals as required by § 23.6 of the Farmland Assessment Act, N.J.S.A. 54:4-23.1 et seq.; that, because for the tax years 1985 *177 and 1986 its application for farmland assessment was predicated upon harvested cropland, it should not be now permitted to attempt to prove qualification by an alleged horse farm; that the harvested cropland area is less than five acres; that the property is not devoted to the production for sale of animals and that the dominant use of the property is the boarding of horses and not to agricultural devotion.
Osborne testified that from 1980 to the present she leased and lived on the property; that during this time she operated a “horse farm” and harvested alfalfa thereon. She stated that the property has two barns which she used for housing and “raising horses;” that she “raised brood mares and foals,” grazed horses and sold horses from the property.
Prior to leasing the property she operated another horse-boarding farm which was her only other horse-farm experience. Upon entering her lease, she brought four or five horses owned by her to the property and subsequently arranged for others to board their horses there.
In 1983, she kept at least ten horses on the property; in 1984 and 1985 between ten and 15 horses and in 1986 and 1987 an average of 15 horses. From 1983 through 1985 she owned four horses and in 1986 and 1987 she owned five horses. The other horses not owned by her were boarded there and their owners paid her for their board, feed and other incidental services rendered. She testified that in addition to boarding the horses she fed them, turned them out of the stables, cleaned the stables and provided incidental services such as shipping them to Monmouth Race Track and Connecticut for which she received extra compensation. She also arranged for blacksmithing performed by others and for medical treatment for the horses when required. She claimed she did not train racehorses, however, later she stated that she did train horses. In addition to racehorses, riding and show horses were located on the property.
The boarded horses were on the property for various periods of time; some for weeks at a time while the owners were away *178 and could not keep the horses at the owners’ properties; some for five or six months; and others from one to several years. She stated that approximately four or five of the horses lived solely on the pastureland and the remaining horses lived half of the day on the pastureland and returned to the barn for the night. It was not clear whether this was also true for the winter months and during inclement weather.
Osborne stated that throughout her leasehold there existed on the property a hayfield, approximately five acres in area, which consisted of alfalfa mixed with timothy. During her full leasehold the hayfield’s size had not changed and no one had ever seeded it. To the best of her knowledge, between 1983 and 1987 the field was cut annually a minimum of once and in some years as many as three times. From the first cutting she approximated 200 bales were secured; from the second cutting, approximately 100 bales; and she estimated that the market price during 1983 and 1984 was $2.50 to $3 a bale. Throughout this period the cutting was performed by one, George Butt, who performed this service for her in return for free board for his horse. She also testified that during the years in issue, Butt also cut the pastureland and left the cuttings on the ground and that the cuttings were eaten by the grazing horses.
She stated that for those horses that lived solely outdoors feed was provided entirely from the pastureland, whereas, the barn horses were fed by feed that was purchased by her and by supplemental feed consisting of the hayfield crop.
She also testified that, from 1980 through 1986, there were three foals born on the property; one in 1984, another in 1985 and the third in 1986. All of these foals were born to horses owned by other persons, but which were boarded on the property. During this period approximately seven horses that had lived on the property were sold for prices ranging from $3,000 to $8,500. Only one of the horses sold belonged to Osborne and none of them had been born on the property.
The township’s current assessor, Schick, testified that he assumed his office in January 1985; that the subject property *179 had originally been granted farmland assessment in 1984 for the tax year 1985 by his predecessor who, at the time, was terminally ill with Lou Gehrig’s Disease and had since died. In 1985, the Hunterdon County Board of Taxation conducted an audit of Tewksbury Township’s farmland assessments and submitted to the newly appointed assessor a list of properties whose farmland qualifications the board questioned; included among them was the subject property. Schick reviewed the subject’s farmland applications filed for the tax years 1983, 1984 and 1985 and noted that the stated qualifying activities for all three years was 14 acres of cropland harvested and the sole income was from alfalfa hay, ranging from $1,200 to $1,776. Schick first viewed the property in the summer, and again in the fall, of 1985. On these visits he inspected the property by walking along its perimeter and upon the grounds. He observed the hayfield and by using a steel tape he measured its four sides to arrive at the square footage which he then divided to arrive at 3.54 acres. He examined the growth and found that it contained a mixture of various types of grass but no alfalfa. He noticed that there were only three or four horses in an area that was fenced off and saw no farming activity on the balance of the property. What he saw was a 46-acre parcel of ground that was primarily grown up in cedar trees with some rough pasture. He later returned in the fall and took photos of the property. Based on his inspection, his determination that the hayfield was less than five acres and his observation that no other agricultural activity was evident nor had been claimed by the taxpayer in its applications, he revoked the farmland assessment for 1985 and assessed to the taxpayer the differential tax by way of an added assessment.
He subsequently drove past the property many times, stopping on a couple occasions to see whether it was any different from when he made his original inspection. The only difference he noted was that sometimes he saw no horses whatsoever. He admitted that he did not go into the barn, nor did he make an inquiry as to whether there had been a sale of horses from the property or foals born thereon. Again, based *180 upon his observations and determinations, in late 1985, after receiving the application for 1986 farmland assessment, he denied it.
He also stated that subsequently he spoke with Osborne and that they talked about what kind of horse operation she had on the property. She advised that in general she owned a couple of horses; that there was horse boarding going on with horses going in and out of the property constantly and that a couple of foals had been born there over the years. Based upon his observations he denied the 1987 farmland application also.
Plaintiffs claim they are entitled to farmland assessment for all three years in issue because: (1) the subject property consists of more than five acres and the minimum value of hay harvested from the alfalfa field exceeded $750; (2) the estimated value of the pastureland hay consumed by the grazing horses equaled $3,650 per year; and (3) the foals born on the property were products of the land; their brood mares had been sustained by eating hay from the property; that sales of horses in 1985 equaled $22,500 and the sale price of Osborne’s horse in 1986 was $6,500.
The township defends that for the tax years 1985 and 1986 plaintiff, Interstate, is bound by the filed verified written claims for its farmland qualifications and the facts alleged therein for those two years which claimed qualification based upon an alleged cropland harvested hayfield of 14 acres which produced incomes of $1,200 and $1,390 respectively; and, because the facts unequivocally prove that the subject property does not so qualify, the taxpayers cannot now be permitted to attempt to establish a totally different qualification; to wit: the breeding and sale of horses. Accordingly, the denials for 1985 and 1986 should be affirmed and because of said denials, the 1987 farmland assessment is also inappropriate since it lacks two pre-year farmland qualifications. In the alternative, the township urges that the tenant’s alleged horse operation was not sufficiently “devoted” to qualify it for farmland assessment under the act for the three years in question.
*181 In response, plaintiffs contend that differences in the claimed use and income as set forth in the filed applications from the facts adduced at trial are irrelevant for determining farmland assessment qualifications; and instead, the only criterion is whether the property’s actual use qualifies.
Article 8, § 1, Par. 1(b) of the New Jersey Constitution grants special favored tax treatment to actively devoted farmland and provides therein that such property will be so valued “on application of the owner.” Implementing this amendment our Legislature adopted the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 et seq. [the act]. For land actively devoted to agricultural use to be eligible for its benefits, the act directs that an owner must file an application with the assessor on or before August 1 of each pretax year separately on a form prescribed by the Director of the Division of Taxation. N.J.S.A. 54:4-23.13. Upon receipt of a timely filed application, the assessor is required, when a claim has been disallowed, to forward a notice of disallowance to the owner on or before November 1 of the pretax year and “the assessor shall set forth his reason or reasons therefor.” N.J.S.A. 54:4-23.13b. This legislative requirement for the filing of the farmland assessment application is to notice the assessor as to the exact agricultural or horticultural use the owner is claiming and the facts relied upon in support thereof so the assessor may check it out and make an informed determination whether the application sets forth a claim recognized by the act and whether the facts found by him support the claim. The fact that the assessor is directed to notify the owner of a denial by November 1 of the pretax year clearly manifests that the assessor must make his examination and determination and, if denied, the reasons therefor by November 1. When the assessor makes his physical inspection, naturally and logically, he is guided by the application as to what facts he should investigate.
The 1983 through 1987 applications which were placed in evidence disclose the following: all five applications filed on behalf of plaintiff, Interstate, were signed by Lawrence S. *182 Berger as partner. Each of the 1988 through 1986 applications certified the property’s land use classes to be 14 acres of cropland harvested; the claimed pastureland was listed variously from 26 to 28 acres; and, on some forms it was listed as cropland pastured and on others as permanent pasture. The standard supplemental farmland forms attached to each application, which are normally signed by the person farming the land, were executed as follows: 1983, 1984 and 1985 by one Charles H. Hildebrandt; 1986 by one Bartnett (the first name is illegible) and 1987 by Laura Osborne. The 1983 supplemental certified the cropland harvested use to be divided between alfalfa, eight acres and orchard garden, six acres; and the sole source of income to be $1,510.25 from alfalfa hay. The 1984 supplemental certified the cropland harvested use to be hay, 14 acres and the sole source of income to be $1,776.25 from alfalfa hay. The 1985 supplemental certified the cropland harvested use to be alfalfa, eight acres; orchard grass, six acres and the sole source of income to be $1,200 from hay. The 1986 supplemental certified the cropland harvested use to be divided between orchard grass, five acres and rye, nine acres and the sole source of income to be $400 from hay, $540 from rye and grain and $450 from rye straw for a total income of $1,390. Although the 1983 through 1986 applications show variations from cropland pasture to permanent pasture, none of them indicate any income therefrom. The 1986 application for the first time lists five horses as being on the property, but again no income therefrom is listed.
The 1987 application and attached supplemental is dated July 26, 1986, which is after the 1985 and 1986 tax-year farmland denials and after appeals to this court for both years had been filed. The application reduces the cropland harvested area to four acres, increases permanent pasture to 38 and lists average number of livestock to 14. The supplemental form, signed by Osborne, certifies the income as $850 from hay and attaches statements for sale of various horses and bills relating to boarding of horses.
*183 Although Osborne claimed that she thought the hayfield was approximately five acres, she gave no basis for her conclusion, admitting that she had never measured it. Schick measured all four sides of this field by use of a steel tape whereby he obtained his side measurements which he multiplied to get the square footage and he calculated that to be 3.54 acres. I also note that plaintiffs acknowledged in the 1987 application that the acreage was less than five acres. I find that the measurements as taken by Schick are accurate, therefore, I specifically find the hayfield is 3.54 acres. It was further testified to by Osborne that the hayfield had not changed during the full term of her lease, therefore, I find that the hayfield was only 3.54 acres in the years 1983 through 1987.
In the summer of 1985, when Schick inspected the subject property to ascertain whether any action should be instituted to revoke the 1985 farmland assessment, he had before him the 1983 through 1985 applications; and, for the 1986 tax year request, he had the additional 1986 application. As heretofore noted, the only agricultural activity claimed was 14 acres of cropland harvested which produced an annual income of $1,510, $1,776 and $1,200 respectively. No income was shown from the pastureland and no horse breeding activity was indicated. I find that the 1985 farmland application, and its attached supplemental form, was an application based upon representations that the subject property qualified based upon its active devotion to agriculture of a tract of land consisting of 14 acres of cropland harvested; that this tract was devoted to the growing of alfalfa and orchard-grass hay and this hay produced an income of $1,200. Likewise, I find that the 1986 application made the same representations, different only in the amount of income of $1,390. I further find that no application was made or notice given, that the farm qualified as being actively devoted to the production for sale of horses. I further find that the above-listed information for 1985 and 1986 which was certified by the owner and also by Hildebrandt and Bart- *184 nett,[1] respectively, was incorrect, that the information set forth therein was with the intention that it be relied upon by the assessor to grant a farmland assessment based upon the growing of more than five acres of hay which produced income in excess of $1,200 for 1985 and $1,390 for 1986.
As heretofore resolved, in the summer of 1985 when, at the direction of the county board, Schick inspected the property to ascertain whether any action should be instituted to revoke the 1985 farmland assessment, he had before him the 1983 through 1985 forms. For the 1986 tax year request he had the additional 1986 application. For both tax years it was reasonable for Schick to rely upon the information contained in the applications as being the sole basis for the taxpayer’s farmland qualification. In reliance thereon he measured the hayfield and found it to be less than the statutory required five acres. He then examined the balance of the property and looked for areas that were represented as farmed and found nothing to conclude that the property qualified as devoted to agricultural use in accordance with the act. Based upon his factual finding that the property’s use did not support the representations of the application, he instituted the revocation proceedings for the 1985 tax year; and, when the 1986 application was received, he denied it.
 I find that the certifications of the cropland harvested’s acreage and the income derived therefrom were misrepresentations of material facts which formed the basis of the then assessor’s originally granting the 1985 farmland assessment. It also was the basis for Schick’s revoking the 1985 action and for denying the 1986 application. I find that the assessor’s reliance upon these misrepresentations was reasonable and that it was not reasonable to expect him to make an examination at that time as to whether the property was devoted to any other *185 use such as the production and sale of horses. It was not until after the 1985 and 1986 appeals were filed with this court that the assessor received any evidence or information that the land allegedly was used for the production and sale of horses. I further find that the misrepresentation prejudiced the municipality whereby it did not conduct an immediate investigation in the years 1985 and 1986 to ascertain the full and correct facts necessary to defend its respective revocation and denial of farmland assessment. The assessor’s examination, measurements, fact-finding and determination were all dictated by the claimed farmland devotions and qualifications set forth in the applications.
The farmland application is a necessary factual document without which an assessor cannot make an informed determination whether to grant or deny the application as required by the Legislature. In reaching his determination an assessor is entitled to rely on the claims and data contained therein. To conclude otherwise would make the farmland application a ' sham rendering it ineffectual and meaningless; it would completely thwart the Legislature’s scheme of controlling the granting of farmland assessments as evidenced by the act’s requiring the filing of the application and its approval or disapproval in the pretax year.
By reason of the above findings, I conclude that Interstate may not now in this proceeding advance as a basis for its alleged farmland assessment qualification a devotion different from that claimed in its applications; to wit; a farm devoted to the production and sale of horses instead of its claimed 14 acres of cropland harvested and income therefrom for the years 1985 and 1986. Statutes granting preferential tax treatment must be strictly construed against the taxpayer since it provides benefits at the expense of all remaining taxpayers in the taxing district. Green Pond Corp. v. Rockaway Tp., 2 N.J.Tax 273, 289 (Tax Ct.1981); aff’d in part, dism. in part 4 N.J.Tax 534 (App.Div.1982). The burden of proof is on the taxpayer to demonstrate that he had properly filed and was *186 entitled to a farmland assessment. Cherry Hill Indus. Properties v. Voorhees Tp., 186 N.J.Super. 307, 312, 452 A.2d 673 (App.Div.1982), affd as mod. on other grounds 91 N.J. 526, 453 A.2d 850 (1982).
Taxpayers’ claim that actual use is the sole criteria for determining farmland qualification is without merit. For example, property devoted to agricultural use is not entitled to farmland assessment where such use is prohibited by law. Farmland assessment may be denied where there has been a “proper adjudication that the use of such property is itself unlawful,” Byram Tp. v. Western World, Inc., 111 N.J. 222, 237, 544 A.2d 37 (1988), Clearview Estates, Inc. v. Mountain Lakes Boro., 188 N.J.Super. 99, 456 A.2d 111 (App.Div.1982). Agriculturally devoted lands are also denied farmland assessment when an application has not been filed or filed late. See N.J.S.A. 54:4-23.13, -23.13b and N.J.A.C. 18:15-2.1 (eligibility under the act shall be determined for each tax year separately and an application shall be submitted on or before August 1 of the pretax year). Cherry Hill Indus. Properties v. Voorhees Tp., supra (Taxpayer’s failure to file the application rendered the land ineligible for farmland assessment for the ensuing tax year). Hashomer Hatzair, Inc. v. East Windsor Tp., 176 N.J.Super. 250, 1 N.J.Tax 115, 422 A.2d 808 (Tax Ct.1980) (a farmland assessment application must be filed by August 1).
Accordingly, I conclude that the taxpayer’s farmland assessment claims for 1985 and 1986 are to be tested solely by whether the property qualifies as cropland harvested for the production of hay. Based upon these criteria, I find that less than five acres of the subject property was actively devoted to cropland harvested for the growing of hay or related grasses and that plaintiffs failed to establish that the property produced gross sales of at least $500.
Osborne did not cut or bale any of the hay from the hayfield nor did she cut any hay from the pastureland; these chores were allegedly done by one, Butt, who did not testify. I find there is insufficient proof to establish that Butt cut the pasture- *187 lands, or if he did, the amount of hay cut therefrom. No record was kept of the amount of hay cut. Osborne did not know how many cuttings were made annually nor how many bales were produced from each. All figures testified to by her were estimates, averages and generalizations without any data to support them. It is obvious from her own nonsupported estimates that the hay produced by the hayfield constituted only a small portion of the total hay consumed by the approximate 15 horses. The majority of the feed necessary was feed produced elsewhere and purchased by Osborne as confirmed by her income tax returns.
Osborne admitted that all the factual information upon which her testimony was based were from records which were not made at the time of their occurrence but instead were reconstructions made from her memory and her checkbook in preparation for her testimony herein. She admitted that her memory was not very good. Her reconstructured facts were contradictory in several instances. I find that the quality of the evidence submitted by plaintiffs is insufficient to meet taxpayers’ burden of proof necessary to establish that the judgments appealed from are erroneous. Pantasote Co. v. Passaic, 100 N.J. 408, 412-413, 495 A.2d 1308 (1985), Byram Tp. v. Western World, Inc., supra, 111 N.J. at 235, 544 A.2d 37.
I also find that the applications failed to claim that the pastureland was actively devoted to the growing of hay; and, even if the applications can be so interpreted, I find, for the same reasons set forth above, that the taxpayers have failed to prove that at least $500 annually was produced from the sale of agricultural products. To establish qualification for farmland assessment the taxpayer has the burden of proof as to all issues. Cherry Hill Indus. Properties v. Voorhees Tp., supra. Based on the foregoing the county board’s judgments denying farmland assessments for 1985 and 1986 are affirmed.
Next to be addressed is taxpayer’s farmland assessment claim for the tax year 1987. The issue to be determined is whether the subject property was “actively devoted to agri *188 cultural use” as mandated by the New Jersey Constitution. As pertaining to this question, N.J.S.A. 54:4-23.3 provides:
Land shall be deemed to be in agriculture use when devoted to the production for sale oi ... animals useful to man, including but not limited to: ... livestock, including ... horses, ... including the breeding and grazing of any or all of such animals____ [Emphasis supplied]
Osborne testified that she leased the subject property in 1980 after having previously run a horse-boarding farm for one year. When she first came to the property she brought with her four of her own horses and subsequently took in horses which she boarded and cared for. Some of these horses she received on consignment for sale. She stated that between 1983 and 1987 she had on the property an average of 10 to 15 horses during which she owned four or five horses.[2]
In addition to boarding the horses she claimed that she cleaned the stables, fed the horses, turned them out of the stables and, at times, made arrangements for their shoeing by others. Also, on two occasions she transported the horses to racetracks in Monmouth and Connecticut for which she was compensated. Although she stated she did not train racehorses, she entered horses in shows and apparently she trained riding horses. Her income tax statements list income from riding lessons. She claimed that she did not provide any medical treatments for the horses, however, her 1985 and 1986 income tax returns show veterinary fees and medicine expenses of $3,460 and $1,901 respectively.
There was no testimony of any breeding of horses conducted on the subject property. Although three foals were born on the property, she did not have any stallions standing at stud on the property nor were breeding services conducted on the property. None of these three foals were born of mares owned by Osborne but instead were owned and boarded by other persons. During this period only six horses were sold, none of which had *189 been born on the property and only one of them was owned by Osborne.
I find that the above-described activity conducted on this property between 1980 through 1986 does not constitute a horse breeding farm nor was the property actively devoted to the production for sale of horses. The business conducted was the boarding of horses which is not an agricultural use for which farmland assessment can be granted. Bloomingdale Ind. Park v. Borough of Bloomingdale, 1 N.J.Tax 145 (Tax Ct.1980). Compare Miele v. Tp. of Jackson, 11 N.J.Tax 97 (App.Div.1989) (Bringing racehorses onto the farm for the purpose of resting them or rehabilitating them between races or caring for them if they are injured is not an agricultural use for which farmland assessment can be granted). The birth of three foals by horses owned by others and the sale of six horses, only one of which was owned by Osborne, over a period of six years, does not constitute the breeding and grazing of such animals. These births and sales were incidental to the primary business of boarding horses.
When the primary and dominate use of a property is not a qualified devotion to agricultural use, an incidental agricultural use does not entitle the property to the benefits of a farmland assessment. City of East Orange v. Tp. of Livingston, 102 N.J.Super. 512, 246 A.2d 178 (Law Div.1968), aff’d 54 N.J. 96, 253 A.2d 546 (1969). In Bloomingdale Ind. Park, supra, Judge Hopkins made a finding that the subject property there was used during the tax year involved and in the prior two years for the production for sale of horses (a factual finding which is contrary to the instant case), however, he also found that the property was used in the boarding of horses owned by other individuals, the training of horses owned by other individuals and the training of young horse riders. Finding that the dominant operation was essentially a service operation for other individuals rather than a production operation for sale of horses, Judge Hopkins concluded that the property was not devoted to an agricultural purpose within the provisions of *190 N.J.S.A. 54:4-28.3. To paraphrase Justice [then Judge] Handler, “in no sense, therefore, can it be said that” the subject property “is devoted, that is committed or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of agricultural products of any kind within the meaning of the Farmland Assessment Act of 1964. To the contrary, it is devoted to the purpose” of boarding horses. City of East Orange v. Tp. of Livingston, supra, 102 N.J.Super. at 537, 246 A.2d 178.
Accordingly, since the subject property was not primarily used for the production for sale of horses, including the breeding thereof, I conclude that it was not actively devoted to an agricultural purpose within the provisions of N.J.S.A. 54:4-23.3. The township’s denial of farmland assessment for tax year 1987 is also affirmed.

 Neither Hildebrandt nor Bartnett was called as a witness nor did plaintiffs offer any explanation as to why either one signed the four applications nor the basis therefor.

 Her records indicate that at times she had more than 15 horses and it is not clear from her testimony whether this average included the four or five horses owned by her.