RIMM, J.T.C.
This is a local property tax matter in which the taxpayer seeks to have the subject properties declared qualified for farmland assessment for the tax year 1992 in accordance with the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 to 23.23 (hereafter the *383 Act), especially N.J.S.A. 54:4-23.3, as amended, and N.J.S.A 54:4-23.3a.
The subject of this litigation is six separately assessed, unimproved contiguous parcels owned by defendant. The land assessments and the total assessments are the same. The block and lot
numbers, original assessments and judgments of the Atlantic County Board of Taxation are as follows:
Block Lot Original Assessments County Board Judgments
30 1 $160,600 $14,000
31 1 $ 92,000 $ 3,500
32 1 $ 95,000 $ 5,200
33 1 $125,300 $ 5,000
34 1 $ 73,300 $ 2,700
36 1 $234,000 . $ 9,700
The original assessments aggregate $780,200. The county board judgments aggregate $40,100 and are based on the board’s determination that the lands qualify for farmland assessment.
There is no dispute between the parties as to the value of the property. If the land qualifies for farmland assessment, the assessments for 1992 will be in the amounts fixed by the county board judgments. If the lands do not qualify for farmland assessment, the 1992 assessments will be in the amounts originally fixed by the assessor.
The parties have stipulated that the total acreage for all six lots is 351.32 acres. Defendant has owned the property since 1972. He filed a timely application for farmland assessment qualification for 1992 on July 30, 1991. By letter dated December 20, 1991, plaintiffs tax assessor denied defendant’s application for farmland assessment for the subject properties because there was no proof of income and no current cutting permit issued by the city. Defendant was dissatisfied with this denial and filed petitions of appeal with the Atlantic County Board of Taxation to set aside the assessments and to have the properties declared qualified for farmland assessment. By judgments dated August 12, 1992, the *384 county board declared the properties qualified for farmland assessment and fixed the assessments as indicated. Plaintiff municipality was dissatisfied with the county board judgments and filed a complaint in the Tax Court seeking a determination that the properties were not qualified for farmland assessment.
In early 1989, defendant entered into an agreement for the preparation of a woodland management plan by a forester approved by the Department of Environmental Protection (hereinafter the DEP), as required by N.J.S.A. 54:4-23.3.b. The plan was completed on July 18, 1989.
The plan was marked in evidence and is captioned, “Woodland Management Plan for Harry Stern, P.O. Box 23035, Philadelphia, Pennsylvania 19124, Property in City of Estell Manor, Atlantic County, New Jersey, Blocks 30, 31, 32, 33, 34 and 36, all lots, 365 acres, prepared by Richard B. Mires, R.P.F., New Jersey approved forester, 1851 W. Landis Avenue, Vineland, New Jersey 08360, Ten-Year Plan, July 18, 1989” (hereafter the plan). It contains in it a property description, a description of the property boundaries, ownership goals and management objectives, past activities, timber stand descriptions of three separate timber stands, designated Stands 1, 2, and 3, management recommendations and a productivity statement. The management recommendations and productivity statement are here quoted in full:

Management Recommendations

1. Boundary marking will be necessary on all northerly property lines, beginning at 14th Avenue and ending at Beach Avenue. I recommend signs and/or tree paint in two bands or stripes as high as can conveniently be reached, approximately 50 to 100 feet apart on line trees and three stripes on corner witness trees. This work must be completed within three years.
2. To plan for the harvest of sawtimber size pine, particularly on portions of Stand 3 best suited for such harvest. This work would be scheduled for the latter years of the plan, in concert with market availability and the owner’s requirements. I recommend clear cutting of small, irregularly shaped areas of approximately three to five acres to afford the best possible character." I estimate harvest of approximately 40 MBF of sawlogs and 41 cords of pulpwood or shaving wood in approximately 400 trees.
3. To reopen, to woods road condition, the extension of 13th Avenue for purposes of fire protection and access for other forestry activity, including future harvest and/or insect or disease control, recognizing that this may create further opportuni *385 ty for trash dumping, which is an on going problem. This work should be scheduled for mid years of the plan following completion of the boundary work.
4. To continue to monitor the establishment and maturing of the young stands, and to determine if weeding or thinning is desirable or practical; and to take appropriate action in the event of insect or disease outbreak.

Productivity Statement

The overall productivity of the tract, as discussed in the Stand Description, is in the moderate range of 80 to 90 cubic feet per acre per year. Based upon current growing stock, I estimate total annual growth to be approximately 200 cords. As the young stands mature and grow into small poletimber sizes where measurement takes place, total volume growth will increase sharply in the latter years of this plan term or the early years of the next term.
I further estimate gross receipts from the sale of sawtimber and pulpwood from Stand 3 to range from $6,300 to $6,800.
A review of the various maps marked in evidence discloses the approximate description of the property with regard to streets, tax block numbers and a creek. A map of the property is set forth as Appendix A to this opinion Blocks 30, 31, 32 and 36, from west to east, front on Maple Avenue, which forms the southern boundary of the tract and which extends for the entire length of the blocks. The westerly boundary of the property, running along the westerly edge of Block 30, is 14th Avenue, if extended north of Maple Avenue to the northerly line of Block 30. The easterly boundary of the tract is: 11th Avenue running along the easterly edge of Block 36 to Beach Avenue; then Beach Avenue which extends in a northwesterly direction along the northern boundary of Block 36 to 12th Avenue; then 12th Avenue, if extended north of Beach Avenue, such extended avenue also being the easterly boundary line of Block 34. The northerly boundary line is an irregular line extending in a westerly direction from 12th Avenue, if extended, to 14th Avenue, if extended.
Stand 1 in the plan consists of Blocks 30, 31 and 32 and constitutes the entire western portion of the tract. Blocks 33 and 34 constitute Stand 2, the northeasterly section of the tract. Stand 3 consists of Block 36 and is the eastern section of the tract.
Stephen Creek runs in an east-west direction across Stands 1 and 2 just south of the northern boundary of the tract.
*386 The forester who prepared the plan was the taxpayer’s first witness. He testified as to the activities he had undertaken to implement the plan. After preparing the plan in 1989, he went back to the property in the spring of 1990. At that time, he marked boundaries at the corner of Beach Avenue and 12th Avenue; along 11th Avenue between Beach Avenue and Maple Avenue; at the corner of 12th Avenue and Maple Avenue; along Maple Avenue between 12th and 13th Avenues; at the corner' of Maple Avenue and 14th Avenue; and then partially along 14th Avenue. These constituted the southerly, easterly and westerly boundaries of the property.
The forester also testified that there were trails on the property that were passable by four-wheel drive vehicles or forest fire fighting equipment vehicles. He also found evidence of disease or insect infestation, but he did not find any major outbreaks of insect infestation or disease that would require action on the part of the property owner.
The forester went to the property again in 1991. In 1991, the forester marked boundaries from Beach Avenue at 12th Avenue to the corner of timber Stand 2 as described in the plan; all of the boundaries previously described as having been partially marked were completely marked between 11th Avenue and 12th Avenue on Beach Avenue; between 11th and 12th Avenues on Maple Avenue; between 13th and 14th Avenues; and on 14th Avenue to Stephen Creek, as shown on the plan.
The forester testified that, although his management recommendations included the marking of the northern boundary line, up to the submission of the application for farmland assessment for the tax year 1992, which is dated July 30, 1991, the northern boundary line of the property had not been marked. In addition, although the plan called for the marking of the boundaries within three years of the submission of the plan, the forester testified that he had not marked the northern boundary within the three-year period.
A second recommendation in the plan was that there should be small, clear-cut areas of mature timber in Stand 3. However, an *387 application to the Pinelands Commission by the forester on May 3, 1993, was for permission to harvest trees from Stand 1. No cutting had been undertaken in Stand 3 in accordance with the plan. Nor had any timber been cut on the subject property between the date of the preparation of the plan in May, 1989 and July 2,1993, the date of the forester’s testimony in this matter. It follows from that fact that there had been no sales of any timber from the tract between May, 1989, and July 2, 1993.
The third recommendation in the plan was to reopen 13th Avenue for fire protection and access purposes. The forester testified that this had not been completely done. Actually, no work had been done on 13th Avenue between the date of the plan and the 1991 inspection by the forester. In addition, between 1989 and 1992, no effort was made to construct any fire protection system on the subject property.
The fourth and final recommendation in the plan provided for monitoring the property to determine if weeding or thinning was desirable or practical. However, no weeding or thinning had been done by the forester. In sum, the forester testified that between July 18, 1989 and December 31, 1992, a period of approximately three and one-half years, to his personal knowledge, there were no activities on the entire 351.32 acre tract other than boundary marking and monitoring. By monitoring, the forester explained he meant the two inspections he made, one in 1990 and one in 1991.
A second professional registered forester also testified on behalf of the property owner. He began his work on the subject property in the fall of 1991. His first work was an attempt to locate the northern boundary so that it could be marked. He referred to deeds and aerial photographs, but advised the property owner that he did not have the necessary information to establish the northern boundary line. He began his field work in the spring of 1992. He marked part of the boundary line with paint. Part of the boundary line was only flagged because he wasn’t sure of the location of the entire length of the northern boundary line. He also testified that he believed that a pine *388 harvest should be pursued. He concluded that the harvesting should begin in Stand 1 and not in Stand 8 as set forth in the plan.
This forester testified that it was his opinion that woodland management plans are guides; and that as work on the property progresses through the years, decisions could be made that would change the original plan. So, in addition to the harvest which he recommended, he also recommended that there be a prescribed burn. Accordingly, in December, 1992, he met with an employee of the forest fire service at the property. As a result of what he was told by the employee of the forest fire service, he developed a burning plan. He discussed the burning plan with the owner of the property with regard to the costs for a contractor, insurance, trail construction and a crew to conduct the burning. Trail construction was completed by the end of January, 1993. However, no burning took place that spring because of the wet weather.
The second forester put up yellow plastic forest management signs along Beach Avenue and 12th Avenue for Stand 2. The signs read, “Forest Management Area. No Trespassing. No Deerhunting. No Trash Dumping.” He also marked boundaries for Stand 2, but all of his other activity in 1993 was in Stand 1.
In October, 1992, he posted the entire eastern portion of Beach Avenue, the southern portion of 11th Avenue and the Maple Avenue perimeter for Stand 3 with yellow plastic forest management signs. However, the witness also testified that as of July 2, 1993, approximately 60% to 75% of the northern boundary still had not been marked. The witness also indicated that his harvest plan with regard to Stand 1 was inconsistent with the plan which referred to a harvest on Stand 3. Additionally, the work done to open 13th Avenue was not completed until January, 1993. This forester then turned the file back to the forester who had prepared the original plan.
The municipality called three witnesses in this matter. One is the assessor; one is a professional consulting forester; and the third is an employee of the State of New Jersey Forest Management Section.
*389 The assessor testified that he has been tax assessor since May, 1992. He testified that he was familiar with the property and that he had reviewed the application for farmland assessment for 1992 in detail in preparation for the trial. He referred to a package of documents, which had been marked in evidence as a joint exhibit, and which in turn referred to the defendant’s application for farmland assessment for the tax year 1992. Among those documents was a letter dated December 20, 1991 to the property owner from the then tax assessor for the city. The letter advised the property owner that his application for farmland assessment for the subject property for 1992 had been disapproved by him for the following reasons: (1) no proof of income for the prior two years; and (2) no current cutting permit issued by Estell Manor. The witness testified that he concurred with the prior assessor’s determination based on his own investigation of the matter. He further testified that there was no evidence of any tree cutting on the property for the two years prior to the year for which farmland assessment was sought. He also testified that there was no evidence of opening roadways on the property for logging purposes or for any other access purposes for the two years prior to the year for which farmland qualification was sought. He indicated, however, that there was evidence of boundary line marking. There was also no submission of information or data dealing with anticipated income from the property. He did testify that there were “some fire lines cut in there this springtime, January or February 1993.” He had not, however, seen any activity relating to fire control prior to the submission of the application for 1992 on July 30, 1991.
The assessor testified that he made his first inspection of the subject property, as the assessor, in the latter part of the summer of 1992 in anticipation of this litigation. He believes that he rode the perimeter of the property and that he saw no activity anywhere on the property. He drove the complete length of Maple Avenue from 14th Avenue to 11th Avenue. He drove 11th Avenue between Maple Avenue and Beach Avenue. He drove Beach Avenue to 12th Avenue. He drove up 12th Avenue as far as he could go in a northeasterly direction, until it turned into a woods *390 road. He then walked some distance up that woods road. He saw “no forestry activity.” The next time he was on the property was in October, 1992 with the state forester. At that time, he started his inspection of the property at the intersection of 11th Avenue and Maple Avenues and went northeast on 11th Avenue to Beach Avenue. He turned left onto Beach Avenue and went to the intersection of 12th Avenue. He turned right on 12th Avenue and went as far as he could go to a dirt road, on which dirt road he then walked a short distance. He then returned to his vehicle and traversed 12th Avenue “straight through across Stephen Creek” to Maple Avenue. On Maple Avenue he made a right turn and went as far as 13th Avenue. On 13th Avenue he drove all the way to Stephen Creek. There is a road between 13th and 14th Avenues near Stephen Creek which he drove to 14th Avenue along which he then drove to Maple Avenue and then to 13th Avenue again. He saw no sign of any forestry activity “with the exception of some boundary markings.” He also testified that, according to the information he had received on farmland applications, the boundary of Stand 2, the northwesterly boundary of the property, had been flagged, but he found no flags. He saw no equipment on the property; he saw no roadways other than those on which he traveled; he saw no trails of any kind; he saw no logging trails; he saw no activity which would indicate the clearing of any brush or undergrowth; he saw nothing which would indicate the recent cutting of trees; and he saw no fire lanes of recent origin in the fall of 1992. He also did not see any activity which would indicate that any of the so called “4-D trees” had been removed, that is diseased, dying, deformed and dead trees.
The assessor testified that he also was on part of the property in December, 1992 but saw nothing that indicated that there had been any activity between the time of his inspection on October 9, 1992 and his being on the property in December, 1992. He was next on the property in January, 1993. At that time, he observed that fire lines had been put in on Stand 1. He saw no evidence of any other activity on the property.
*391 On cross-examination, he stated that there was income information in the plan which reads: “I further estimate gross receipts from the sale of sawed timber and pulpwood from Stand 3 to range from $6300 to $6800.”
The city’s forester testified that the subject plan first came to his attention on or about October 22,1992. He examined the plan and then made an inspection of the property to see if the plan was consistent with proper forestry standards for the property. The inspection was made on October 22, 1992. He concluded that the plan was “weak in that forest fire protection was not adequately treated in the overall plan.”
The plan specifies that 13th Avenue was to be “reopened to woods road condition.” The importance of opening the road, according to the witness, was to provide access in case of fire and to create a forest fire break. Dining his inspection, he did not find any evidence that the road had been reopened.
On October 22,1992, he inspected all three stands. He located, as far as possible, the outbounds of the property; and he then made a systematic inspection of the property by “spaced walking ... through the property observing and making notes as ... [he] went.” He spent approximately &k to 7 hours on the property on October 22, 1992. He made cursory inspections in January, February, and May, 1993. He also made four inspections in June, 1993, on June 3, 6, 7 and 22, spending in excess of two days total time on the property during the four inspections. During the inspections in June, 1993, he collected data concerning activity on the property and took measurements of various trees and tree stands. He said that, to some degree, he inspected all of the property, “all three stands ... in other words blocks 30 through 36.” As a result of his work, he concluded that the plan is not an appropriate plan for proper woodland management on the subject property. In addition to his concerns about the lack of specificity with regard to fire protection, he said that the plan did not adequately treat the management of Atlantic white cedar found on the property. While the cedar was mentioned in the plan, there was no ongoing plan concerning the management of the cedar *392 growth. He also said that there was “vagueness” in specifying a timetable for the various activities referred to in the plan.
When asked specifically what activity should have occurred on the property up to the end of 1991 in order to conform to the plan, he replied as follows:
First of all, the boundary line marking appeared to be incomplete; secondly, there was an opportunity to cut some mature pine in at least one locality; thirdly, there was management activity which, in my opinion, should have been executed to thin some young pine stands in ... Block 36.
Block 36 is in that part of the property designated as Stand 3 in the plan. He testified that there was timber on the property which had reached maturity and had gone beyond maturity into decline. He specifically identified an area in Block 36 on the south side of 12th Avenue, if extended south through the tract, about 450 feet from Beach Avenue. He measured all of the trees on approximately one acre of that area and was able to determine, by appropriate calculations, that there was a total of 4,153 board feet of lumber in that one area. All the trees in the area were, in his opinion, merchantable. They were all 12 to 19 inches in diameter at % feet above the ground. The acre which he measured was surrounded by approximately 10 acres of similar pine trees. These pines were easily accessible by 12th Avenue, could easily have been harvested, and were not only mature but ran the risk of deterioration by a failure to harvest. In summary, the only evidence of activity that he found between 1989 and the end of 1991 based on his inspections was a partial marking of some of the boundary lines.
In addition to other deficiencies, it was the forester’s opinion that the property owner was not complying with his own plan for the subject property between 1989, the year in which the plan was submitted, and 1991, the year before the year for which farmland assessment is sought in this ease. Specifically, the witness referred to item 4. under Management Recommendations which has heretofore been quoted in full. The witness said that his inspections disclosed that thinning in the pine stands was practical and, from a standpoint of good forest management, desirable; but that no such thinning had taken place up to the end of 1991. Such *393 thinning, in the witness’s opinion, should have taken place before the end of 1991.
The witness further expressed his concern about forest fire protection on the property. He said that the area had a history of forest fires over many years. There was physical evidence on the ground of past forest fires, and the risk of forest fires in the area continues. The witness testified that there had been fires during the year 1993, the year in which the trial was held. According to the witness, the property is located in a high hazard area because there is “a good deal of fuel” and the conditions are such that forest fires are a very serious danger.
The witness testified that he also observed dead, diseased and dying trees that should have been removed from the property. He observed this in the cedar stand off Beach Avenue and scattered throughout the property.
During cross-examination, the witness was questioned about what he observed with regard to fire protection activity on the property. He testified that he found two breaks constructed on the property which were constructed some time in the late winter or early spring of 1993. Each break was over 1,000 feet long. The breaks were parallel to each other and extended from one woods road to another woods road. The lines were “very crooked” and they were not properly constructed. The witness testified that fire breaks are consistent with good practice only if they are properly constructed. The fire breaks observed by the witness were not properly constructed in that “they were not tied in on the ends properly.” As the witness said, there was no attempt to tie the ends of the fire breaks into any physical boundary, wetlands or anything of that kind which would make them adequate for fire protection. There was nothing to prevent a fire from going around the ends of the fire breaks. Actually, the witness concluded that the fire break construction did not constitute any substantial fire protection. In addition, the lines were not dug in the proper manner for fire break lines, because they were not dug into the earth. The litter on the surface of the ground was cleared down to the soil, and the debris which had *394 been scraped from the line had been piled up, leaving a flammable pile to “breed at various intervals.” In addition, the lines made sharp turns which is a danger in fire lines because of the direction of the wind.
The state forester testified that his duties involve the overseeing of farmland assessment operations, assisting with fresh water wetlands inspections, tree planting and various other forestry activities. He testified that he inspected the subject property with the assessor on October 9, 1992. No notice of the inspection was given by either him or the assessor to the property owner. As a result of the inspection, he wrote a letter dated October 20, 1992. He said that the letter was “pretty much a form letter used throughout the State of New Jersey.” The letter is quoted in full:
Foresters [sic] of the Bureau of Forest Management have completed an on-site inspection of the referenced property.
The activity on the land is in compliance with the filed Woodland Management Plan and is appropriate for the existing resource. Additionally, the information on the Woodland Data Form (WD-1) is correct.
He then testified that, notwithstanding the wording of his letter of October 20,1992, he did not compare the activities on the property to the plan. He said that he. was comparing the activities on the property with the Woodland Data Form (WD-1) dated June 25, 1992 by the approved forester and July 27, 1992 by the property owner. The form is required to be filed with the local tax assessor and the Division of Parks and Forestry, Bureau of Forest Management. The WD-1 form was attached to the application for farmland assessment, Form FA-1, submitted to the assessor and the Bureau of Forest Management for the tax year 1993. The witness also specifically testified that he could not state that the activities on the property were in compliance with the plan.
The forester then testified from his office file for the property, which file he had brought to court. He testified that the plan was received in his office on August 21,1989, and that on September 5, 1989, he sent a letter to the owner telling him that his application had been received and assigned to his office. He also said that the following statement was contained in the letter, ‘Tour application is sufficient and it satisfies the reporting requirements.” No *395 inspection of the premises was made before the September 5, 1989, letter was sent.
In the following year, before August 1, 1990, an application for farmland assessment was received together with a Woodland Data form. Following that submission, the property owner was sent a letter which said, “We have received your documents, and everything is satisfactory.” This letter was sent on August 22, 1990.
The file then disclosed that an application for farmland assessment, a Woodland Data form, and an activity map were received in the office on August 19,1991. These forms were for the tax year 1992. The witness also testified that, up to August 19, 1991, no inspection had been made of the subject property. The property owner was then sent a letter dated August 20, 1991, which said, “Your application is sufficient and it satisfies reporting requirements. Your tax assessor mil make the final determination of your application.” (Emphasis added.) At the time of that letter of August 20,1991, the witness had not ascertained whether there was compliance with the plan. He further testified that he did not intend to, and that he did not in fact, by his letter of August 20, 1991, indicate that there was compliance with the plan.
The next application, for farmland assessment and the Woodland Data form were received on August 21,1992. A letter was sent to the property owner on August 28, 1992 which stated that, ‘Tour application is sufficient and satisfies the reporting requirements; however, your tax assessor will make the final determination.” (Emphasis added.) Again, the witness testified that no inspection of the property had been made up to October 9,1992. There then followed the inspection of October, 1992 which was the first inspection of the subject property. The witness also testified that the statement in the letter of October 20,1992 that the activity on the land was in compliance with the filed plan was based on information received from the forester employed by the property owner. It was not based on the pei’sonal knowledge of the witness.
*396 I
N.J.S.A 54:4-23.3 was amended by L.1986, c. 201, § 1, effective August 1, 1987, and provides in full as follows:
Land shall be deemed to be in agricultural use when devoted to the production for sale of plants and animals useful to man, including but not limited to: forages and sod crops; grains and feed crops; dairy animals and dairy products; poultry and poultry products; livestock, including beef cattle, sheep, swine, horses, ponies, mules or goats, including the breeding and grazing of any or all of such animals; bees and apiary products; fur animals; trees and forest products; or when devoted to and meeting the requirements and qualifications for payments or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government, except that land which is devoted exclusively to the production for sale of tree and forest products, other than Christmas trees, and is not appurtenant woodland, shall not be deemed to be in agricultural use unless the landowner fulfills the following additional conditions:
a. The landowner establishes and complies with the provisions of a woodland management plan for this land, prepared in accordance with policies, guidelines and practices approved by the Division of Parks and Forestry in the Department of Environmental Protection, in consultation with the Department of Agriculture and the Dean of Cook College at Rutgers, The State University, which policies, guidelines and practices are designed to eliminate excessive and unnecessary cutting;
b. The landowner and a forester from a list of foresters approved by the Department of Environmental Protection annually attest to compliance with subsection a. of this section; and
c. The landowner annually submits an application, as prescribed in section 13 of P.L.1964, e. 48 (C. 54:4-23.13), to the assessor, accompanied by a copy of the plan established pursuant to subsection a. of this section; written documentation of compliance with subsection b. of this section; a supplementary woodland data form setting forth woodland management actions taken in the pre-tax year, the type and quantity of tree and forest products sold, and the amount of income received or anticipated for same; a map of the land showing the location of the activity and the soil group classes of the land; and other pertinent information required by the Director of the Division of Taxation as part of the application for valuation, assessment and taxation, as provided in P.L.1964, c. 48 (C. 54:4^-23.1 et seq.). The landowner shall, at the same time, submit to the Commissioner of the Department of Environmental Protection an exact copy of the application and accompanying information submitted to the assessor pursuant to this subsection. For the purposes of this amendatory and supplementary act, “appurtenant woodland” means a wooded piece of property which is contiguous to, part of, or beneficial to a tract of land, which tract of land has a minimum area of at least five acres devoted to agricultural or horticultural uses other than the production for sale of trees and forest products exclusive of Christmas trees, to which tract of land the woodland is supportive and subordinate.
*397 N.J.S.A. 54:4-23.3a was added to the Farmland Assessment Act by L.1986, e. 201, § 2, effective August 1,1987, and provides in full as follows:
a. Upon receipt of a copy of an application and accompanying information pursuant to section 3 of P.L.1964, c. 48 (C. 54:4-23.3), the Commissioner of the Department of Environmental Protection shall acknowledge receipt of such to both the applicant and the assessor of the taxing district in which the land is situated.
b. The commissioner shall provide for a review of the application for compliance with subsection a. of section 3 of P.L.1964, c. 48 (C. 54:4-23.3). The application review shall include an on-site inspection of the property during one of the first three years in which applications are received, and not less frequently than once every three years following the first inspection.
c. The commissioner shall notify the assessor of the taxing district, in writing, of his findings of compliance or noncompliance of each applicant with subsection a. of section 3 of P.L.1964, c. 48 (C. 54:4^-23.3). If the commissioner indicates to the assessor a finding of compliance, the assessor may, upon his own determination that the property is otherwise qualified for valuation, assessment and taxation, as provided in P.L.1964, c. 48 (C. 54:4-23.1 et seq.), approve or disapprove the application. If the commissioner indicates to the assessor that the applicant is not in compliance, the assessor shall disapprove the application. The assessor’s approval or disapproval shall be transmitted to the applicant as in the case of other applications for valuation, assessment and taxation, as provided in P.L.1964, c. 48 (C. 54:4^23.1 et seq.).
d. In the event that the commissioner does not give timely notice to the assessor of his findings after review of the application, as timely notice is prescribed by rules and regulations adopted by the Director of the Division of Taxation, pursuant to section 3 of this amendatory and supplementary act,[1] the assessor may approve or disapprove the application as in the case of other applications not subject to provisions of this amendatory and supplementary act.
It is also important to note the Assembly Economic Development and Agricultural Committee statement, Assembly, No. 1925-L.1986, c. 201, which reads, in pertinent part, as follows:
Assembly Economic Development And Agriculture Committee Statement
Assembly, No. 1925 — L.1986, c. 201
This bill imposes stricter requirements for certain woodlands to receive the benefits of farmland assessment provided under the “Farmland Assessment Act of *398 1964”. The provisions of the bill apply to any woodland which is used exclusively to produce forest products other than Christmas trees and is not appurtenant to open farmland. For the woodland to qualify for farmland assessment, the bill requires that the owner:
1. Establish and comply with a woodland management plan which conforms to guidelines approved by the Department of Environmental Protection’s Division of Parks and Forestry in consultation with the Department of Agriculture and the Dean of Cook College; and
2. Submit to both the local assessor and the Department of Environmental Protection copies of the plan, documentation of compliance attested by a department-approved forester, and information regarding woodland management actions taken, forest products sold, income received, the location and type of land used and other information required by the Division of Taxation.
The Department of Environmental Protection is directed by the bill to provide for the review of the application and notify the local assessor in writing whether or not the application is in compliance with the requirements of the bill. The bill requires that an on-site inspection be included as part of the review during one of the first three years in which applications are received and at least once every three years following the first inspection.
If an owner of land subject to the provisions of the bill fails to comply with the bill’s requirements, the land, although not receiving a farmland assessment, would not be subject to the roll-back tax currently imposed -when agricultural or horticultural land is converted to other uses.
Following the enactment of the woodland amendments to the Act, the Director, Division of Taxation, adopted N.JAC. 18:15-2.7 to -2.15 to effectuate the Act.
II
Plaintiff argues that defendant’s farmland assessment application should be denied because:
(1) his plan fails to satisfy the requirements of the Act;
(2) the defendant, in any event, is not complying with his own plan;
(3) there has been insufficient forestry activity on the property to support farmland assessment; and
(4) there is insufficient proof of income, or anticipated income, to meet the requirements of the Act.
The DEP, as amicus curiae, contends that the assessor’s- denial of defendant’s farmland assessment application based on his determination that the management plan fails to satisfy the require *399 ments of the Act is ultra vires. The DEP claims that the Act, as amended, delegates to it the exclusive authority to approve or disapprove a woodland management plan and to make the determination of compliance with the plan by the property owner. The DEP, however, does concede that the assessor has the authority to deny a farmland assessment application if the property owner has not proved that the property has met the income and other requirements of the Act. Of course, while defendant joins the DEP in its position with regard to its authority over a woodland management plan, he also argues that there is sufficient proof of income and other compliance to qualify the property for farmland assessment.
Ill
In order to deal with the conflicting contentions of the parties, it is necessary to review the amendments to the Act dealing with land devoted exclusively to the production for sale of tree and forest products. Under the Act, before its amendment, in order to qualify for farmland assessment, a property had to meet the following requirements: (1) be of an area not less than five acres; (2) be actively devoted to agricultural or horticultural use; (3) be so devoted for at least the two successive years immediately preceding the tax year in issue (N.J.S.A 54:4-23.2); (4) have gross sales of agricultural or horticultural products averaging at least $500 per year during the two year period immediately preceding the tax year in issue or have the owner provide clear evidence of anticipated yearly gross sales amounting to at least $500 within a reasonable period of time (with additional income requirements for each acre over five acres) (N.J.S.A. 54:4-23.5); and (5) have an application for evaluation as farmland submitted in a timely manner (N.J.S.A 54:4-23.6).
N.J.S.A 54:4r-23.3, as amended, provides in its lead paragraph that woodland shall not be deemed to be in agricultural use unless the property owner meets the additional conditions set forth in the amendment to the Act. This amendment imposing the additional conditions for woodland to qualify for farmland assessment *400 does not eliminate any of the requirements otherwise set forth in the Act. The additional conditions are:
1. the property owner must establish and comply with a woodland management plan;
2. the property owner and a forester approved by DEP must attest annually “to compliance” with the requirement that the land owner establish and comply with a woodland management plan;
3. the landowner must submit annually an application for farmland assessment qualification under N.J.S.A. 54:4-23.13 to the assessor, the application to be accompanied by the following items: (1) a copy of the woodland management plan; (2) written documentation by the property owner and an approved forester of compliance with the woodland management plan; (3) a supplementary woodland data form; and (4) a map of the land showing activity on the property (N.J.S.A. 54:4-23.3. c.);
4. the property owner shall submit to the DEP an exact copy of his application and accompanying information submitted to the assessor (N.J.S.A. 54:4-23.3. e.);
5. the DEP shall review each application to ensure compliance with the woodland management plan, such review to include an on-site inspection of the property during one of the first three years in which an application is received (N.J.S.A 54:4-23.3a. b.); and
6. the DEP shall notify the assessor that the property owner has or has not established and complied with a woodland management plan in accordance with N.J.S.A 54:23.3. a.
If the DEP notifies the assessor that there has been a finding of compliance, the assessor may approve or disapprove the application for farmland qualification based upon his own determination that the property is otherwise qualified for such farmland assessment in accordance with the Act. ’ In the absence of timely action by the DEP, the assessor may proceed as though the property were not subject to the amendment (N.J.S.A. 54:4-23a.d).
*401 I conclude as a matter of law that the Legislature has now established a two-tier program for woodland to qualify for farmland assessment. First, the property owner must establish and comply with the provisions of a woodland management plan submitted to the DEP. Second, the land must qualify for farmland assessment under all of the requirements of the Act before the amendments. In effect, establishing and complying with a woodland management plan is not a substitute for complying with all of the other requirements necessary for property to qualify for farmland assessment under the Act. Compliance with the amendments to the Act relating to woodland does not excuse compliance with all of the other requirements under the Act for farmland qualification. Even if the DEP finds compliance with the applicable statutory provisions, “the assessor may ... approve or disapprove the application.” N.J.SA 54:4-23.3a.c. Further, if there is no indication from the DEP one way or another, the assessor may make his determination “as in the ease of other applications not subject to provisions of this amendatory and supplementary Act.” N.J.S.A. 54:4-23.3a.d.
IV
N.J.S.A 54:4r-23.3a.c. requires that “[t]he Commissioner shall notify the assessor of the taxing district, in writing of his findings of compliance or non-compliance of each applicant” with the applicant’s woodland management plan.
In this case, there is no indication from the DEP of compliance or non-compliance with the Act. The employee of the State of New Jersey Forest Management Section whose duties involve the overseeing of farmland assessment operations testified that his letter of October 20, 1992, to the effect that activity on the subject property was in compliance with the plan was “pretty much a form letter used throughout the State of New Jersey.” Notwithstanding the wording of his letter, he did not compare the activity on the property to the plan submitted for the property. The assessor therefore made his determination without regard to the amend *402 ments to the Act but based solely on the other requirements of the Act.
V
Even though the municipality is plaintiff in this matter, the burden of proof is on the taxpayer seeking farmland qualification for his property. Miele v. Jackson Tp., 11 N.J.Tax 97, 99 (App.Div.1989). Cf. West Orange Tp. v. Joseph Kushner Hebrew Academy, 13 N.J.Tax 48, 52 (Tax 1993) (“The burden of proving tax-exempt status is always upon the claimant, even when, as in this case, the taxing district initiates the action in this court to overturn a county board judgment.”).
[T]he burden of proof was on the taxpayer to demonstrate that he had properly filed and was entitled to a farmland assessment. The controlling principle was stated in Bloomfield v. Academy of Medicine of New Jersey, 47 N.J. 358 [, 221 A.2d 15] (1966), as follows:
The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function 51 AmJur. Taxation, § 9, p. 42. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption. The burden of proving a tax-exempt status is upon the claimant. Pingry Corp. v. Hillside Tp., 46 N.J. 457, 461 [, 217 A.2d 868] (1966).
[ 47 N.J. at 363, 221 A.2d 15. ]
This same principle is applicable to those seeking preferential tax classification. MacMillan v. Taxation Div. Director, 180 N.J.Super. 175 [, 434 A.2d 620] (App.Div.1981).
[Cherry Hill Indus. Properties v. Voorhees Tp., 186 N.J.Super. 307, 312, 452 A.2d 673 (App.Div.1982) affd as modified on other grounds, 91 N.J. 526, 453 A.2d 850 (1982) ]
In MacMillan v. Director, the court said that statutory provisions for tax preference are strictly construed against those claiming preference or exemption. “This is so with regard to local property taxes.” Bloomfield v. Academy of Medicine of New Jersey, 47 N.J. 358, 363, 221 A.2d 15 (1966).” MacMillan v. Director, Div. of Taxation, 180 N.J.Super. 175, 178, 434 A.2d 620 (App.Div.1981) affd o.b. 89 N.J. 216, 445 A.2d 397 (1982).
Interstate 78 Office Park Ltd. v. Tewksbury Tp., 11 N.J.Tax 172, 185-186 (Tax 1990), is to the same effect that the *403 burden of proof is on the taxpayer to demonstrate that he is entitled to a farmland assessment. Statutes granting preferential tax treatment, of any nature, must be strictly construed against the taxpayer seeking such preferential treatment because they provide benefits at the expense of all the remaining taxpayers in the municipality. Green Pond Corp. v. Rockaway Tp., 2 N.J.Tax 273, 289 (Tax 1981), affd in part and dism’d in part, 4 N.J.Tax 534 (App.Div.1982). The burden of proof in a tax exemption case is always on the party claiming exemption. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). “[T]he Farmland Assessment Act is akin to tax exemption statutes which must be strictly construed against the party claiming the exemption,----” Califon v. Stonegate Properties, 2 N.J.Tax 153, 163 (Tax 1981).
VI
Applying these principles of law to the present case results in a denial of farmland assessment for the subject property.
The assessor has concluded that the subject property does not qualify for farmland assessment. The conclusions are supported by the evidence presented to me and are accepted.
There was no income in the tax year nor in the two years immediately preceding the tax year. Therefore, the income requirements of N.J.S.A. 54:4r-23.5. for qualification as farmland have not been met. There was no evidence that income to meet the requirements of the Act would be realized in a reasonable time. Although there is an estimate in the plan that certain receipts would be realized, the time when the receipts would be realized was not specified. In fact, the two foresters called by the taxpayer could not even agree which trees should be harvested, the number of trees which should be harvested nor the part of the property from which trees should be harvested. Neither forester testified when any harvesting would actually occur, although taxpayer had submitted an application for a cutting permit. Neither forester testified as to the amount of income which would be realized from any harvesting. Yet the Act requires clear evidence *404 of anticipated yearly gross sales at least equal to the minimum income requirements within a reasonable period. N.J.S.A, 54:4— 23.5. Califon v. Stonegate Properties, supra, is instructive on this point and particularly applicable to this case. As Judge Evers said,
While in the case of timber operations the income requirements may not have to be satisfied annually, the statute nevertheless requires clear evidence of anticipated yearly gross sales at least equal to the - minimum income requirement within a reasonable period. Such proofs do not exist here, N.J.S.A 54:4-23.5. Compare Urban Farms v. Township of Wayne, 159 N.J.Super. 61, 386 A.2d 1357 (App.Div. 1978) where, for the tax year and the two preceding years there were sales of firewood, live trees, evergreens; and where the dominant activity on the land was its dedication to a woodland management program for the commercial production of timber; and where the taxpayer had entered into a ten year contract providing for, among other activities, the selective thinning, cutting and planting of seedlings in order to develop the tree growth to its fullest potential and to provide for the reforesting of the lands.
[ 2 N.J.Tax at 167 ]
The evidence of anticipated income, such as it is, is not directed toward the likelihood of sales within a reasonable time. “The statute makes it incumbent upon the taxpayer to present clear evidence of anticipated yearly gross sales of at least [the minimum amount required by the Act].” Green Pond Corp. v. Rockaway Tp., supra, 2 N.J.Tax at 284. Green Pond is further applicable here:
In short, nothing in the record indicates anticipated sales within a reasonable time for this particular woodland. Clear evidence of that fact is required to satisfy the statute. N.J.S.A 54:4-23.5. In the absence of such evidence I cannot find that yearly sales amounting to ... [the minimum requirement] are anticipated within a reasonable time. Plaintiffs, therefore, have not satisfied the income requirements of the statute for the tax year ... and for that year their request for farmland assessment must be denied on that basis alone.
[Id. at 285]
There must be “clear evidence of anticipated yearly gross sales within a reasonable time.” Princeton Research Lands v. Upper Freehold Tp., 4 N.J.Tax 402, 407 (Tax 1982). In fact, the amendments now also require that the application for farmland qualification be accompanied by a supplementary woodland data form setting forth, among other things, “the type and quantity of tree and forest products sold, and the amount of income received or anticipated for same; ----” N.J.S.A. 54:4-23.3.c.
*405 I also find that the activity on the tract does not qualify it for farmland assessment. Between July 18, 1989, the date of the plan, and December 31, 1992, the last day of the year for which farmland assessment qualification was sought, the sum total of activity was a partial marking of boundaries, a partial opening of 13th Street, and monitoring, by which was meant inspections of the property. There was no harvesting, there was no construction of fire breaks, there was no removal of “4-D trees,” nor any other activity which would constitute active devotion to horticultural or agricultural use. See Princeton Research Lands v. Upper Freehold Tp., supra, 4 N.J.Tax at 408. The activities on the subject property were “nothing more than a thinly disguised and ineffective attempt to qualify the property for farmland assessment.” Brunetti v. Lacey Tp., 6 N.J.Tax 565, 575 (Tax 1984).
VII
Since this is a case of first impression interpreting the 1986 amendment to the Farland Assessment Act (L.1986 e. 201) and because the Legislature intended to impose stricter requirements for farmland qualification for woodland than previously existed and to cure deficiencies in the Act relating to woodland, I am constrained to comment on the procedure to be followed if the DEP approves a plan and finds compliance with it, but the assessor disagrees. “Our Supreme Court has observed that a court may go beyond that which is necessary to decide a particular issue if a need for guidance exists. Busik v. Levine, 63 N.J. 351, 363-364, 307 A.2d 571 (1973). It is readily apparent that procedural guidance would be appropriate and useful.” West Milford Tp. v. Garfield Recreation Comm., 194 N.J.Super. 148, 155, 476 A.2d 333 (Law Div.1983).
As indicated, one of the taxpayer’s arguments is that, once he has complied with N.J.S.A 54:4-23.3 and N.J.S.A 54:4-23.3a, he is entitled to farmland assessment without regard to the *406 assessor’s determination that the property is not otherwise entitled to farmland assessment. Neither the DEP itself nor the state forester charged with assisting in the administration of the Act agrees with the taxpayer’s argument. Of course, the taxpayer overlooks the fact that in at least one respect he has failed to comply with the woodland amendments, specifically, the provisions of N.J.S.A 54:4-23.3. He has failed to submit an application to the assessor together with a supplementary woodland data form setting forth “the amount of income received or anticipated for the subject property.” N.J.S.A 54:4-23.3.c.
The DEP contends that it has complete authority to determine compliance with the woodland management plan provisions of the Act, as amended, and, under the clear wording of the statute, the assessor is bound by the determination of the DEP and cannot reject an application on the ground that the plan is not acceptable or that there has not been compliance with the plan if the DEP determines otherwise. The position of the DEP is also clear, however, that the assessor has the final authority to determine whether land otherwise qualifies for farmland assessment. This position is correct, and, to the extent that the taxpayer contends that compliance with a woodland management plan of itself qualifies the land for farmland assessment, the contention is rejected. In interpreting a statute, a court “places great weight on the interpretation of legislation by the administrative agency to whom its enforcements is entrusted.” Pepe v. Princeton Univ., 77 N.J. 55, 69-70, 389 A.2d 465 (1978).
As a.practical matter, if the assessor finds that an applicant has otherwise met the requirements of the Act, he may be hard-pressed to disagree with a favorable determination by the DEP. But if the assessor disagrees with a determination by the DEP that there has been compliance with the woodland provisions of the Act, and that farmland qualification is to be denied on that ground alone, the sole recourse is for the taxing district to challenge the determination of the DEP by appropriate action *407 before a county board of taxation and the Tax Court, if necessary. In the area of local property taxation, the procedure to be followed is the procedure for challenging the assessment and not the procedure for challenging the determination of an administrative agency. The overwhelming indication of legislative intent by the woodland amendments to the Act and by the express authority given ultimately to the assessor is that the entire issue of qualification for farmland assessment is primarily a local property tax matter. Cf. West Milford Tp. v. Garfield Recreation Center, supra:
If West Milford’s assessor found that the claimant did not meet the statutory requirements for exemption, he or she should have assessed the property for its full and fair value. N.J.S.A 54:4-23. It would then have been left to Garfield to pursue an appeal to the county tax board and from there, if unsuccessful, to the Tax Court. N.J.S.A 54:3-21. The Tax Court hears and determines all issues of fact and of law de novo.
[N.J.S.A 2B:13-3, L.1993, c. 74]....
As explained earlier, if this matter had proceeded in the manner intended by the Legislature, a trial de novo might properly have been had in the Tax Court on the issue of whether Garfield and its property met the statutory requirements for exemption.
[ 194 N.J.Super. at 157, 160, 476 A.2d 333 ]
The issue of whether a plan appropriately provides for the care and cultivation of the property is one that must be decided largely on the basis of expert testimony adduced at trial. The weight and value of expert testimony are for the trier of fact to determine. An expert’s opinion may be adopted in whole or in part, or rejected completely. River Drive Village v. Garfield, 7 N.J.Tax 682, 639 (Tax 1985). The determination of the weight to give an expert’s testimony depends not only on his candor, intelligence and experience, but also on facts and reasoning which form the foundation of the expert’s reasoning. Sage v. Bernards Tp., 5 N.J.Tax 52, 72 (Tax 1982), aff'd, 6 N.J.Tax 349 (App.Div.1984).
For example, in this ease, the city’s forester, a well-qualified expert, concluded that the plan is not an appropriate plan for *408 proper woodland management on the subject property. He testified that defendant has a significant amount of Atlantic white cedar growing on his property, but that his plan did not adequately address the cultivation of this important resource. He also testified that, in his opinion, the plan was too vague because it did not adequately address the issues of fire protection or the harvesting of mature trees before they began deteriorating. Some trees had actually died as a result of crowding. Many trees were “commercially mature” and a market for their sale existed, but none were harvested and none were sold.
Similarly, if a taxpayer disagrees with a determination of the DEP that his woodland management plan is not in conformance with the Act, as amended, he will be faced with an assessment which he may challenge by filing a petition of appeal with the county board of taxation and a complaint with the Tax Court, if necessary.
VIII
The relief sought by plaintiff municipality is granted. Judgment will be entered fixing the assessment of all the lots for the tax year 1992 in the same amounts as the original assessments.
*409 APPENDIX A
[[Image here]]

 This section refers to the adoption of rules and regulations by the Director, Division of Taxation, and the Department of Environmental Protection and Energy to effectuate the Act.