KUSKIN, J.T.C.
Plaintiff appeals the disallowance by defendant Borough of Riverdale’s tax assessor of farmland assessment qualification for plaintiffs twenty-five acres of woodlands. The property is designated as Block 36.01, Lot 14 on the Borough tax map. The tax years in issue are 1999, 2000, and 2001. For the reasons set forth below, I hold that the disallowance was proper.
Plaintiffs appeals were the subject of a plenary trial. The following factual findings and legal conclusions are based upon my weighing and analyzing the evidence, my determinations as to the credibility of the witnesses, and my analysis of the post-trial legal briefs submitted by the parties.
I.
The parties stipulated that plaintiff filed timely farmland assessment applications for each year under appeal and that the applications were denied by defendant’s assessor. Defendant acknowledged that, for each year, the application consisted of an *172 Application for Farmland Assessment (Form FA-1) and a Woodland Data Form (Form WD-1), and, for tax years 2000 and 2001, a Stand Map showing the location of the various stands of trees on the subject property and where woodland management activities occurred.
Defendant’s assessor testified that he did not receive a Stand Map as part of plaintiffs application for tax year 1999. Plaintiffs witnesses testified that, based on them general practice in submitting the farmland assessment applications, they believed a Stand Map was included with the 1999 application. Defendant does not dispute that, in addition to the submission for 2000 and 2001, Stand Maps were submitted with the applications filed for tax years 1998 and 2002. Defendant’s assessor testified that, upon receiving each application, he placed different portions in different files so that the Stand Maps were separated from other portions of the application packet. The assessor did not deny farmland assessment qualification for 1999 because of the absence of a Stand Map. Based on the testimony, I find that a Stand Map was part of the farmland assessment application filed by plaintiff for tax year 1999.
For each year, defendant’s assessor disallowed farmland assessment for the same reasons, namely, that the land had not been actively devoted to agricultural use for the year for which the application was filed and the land had not been devoted to agricultural use for the two years preceding the year for which the application was filed.[1]
Plaintiffs applications for farmland assessment were based on a Woodland Management Plan (the “Plan”) prepared by Timothy J. Slavin, a forester approved by New Jersey Department of Envi *173 ronmental Protection. See N.J.S.A. 54:4-23.3(a) and (b). The Plan is dated March 3, 1995 and covers the ten-year period from 1995 through 2004. It describes the primary objective of the property owner to be the lowering of taxes on the subject property by qualifying for farmland assessment. The Plan describes four stands of trees located on the property, each of which is designated by a Roman numeral. For the years 1995 through 2000, the Plan recommends that “[tjhe dominant overstory of hardwoods in Stand IV be removed at the rate of approximately 6 cords annually.” For the years 2001 through 2004, the Plan recommends as follows: “Stand II should be thinned to approximately the ‘B’ stocking level concentrating on the removal of unacceptable growing stock using as the first criteria [sic] for cull selection species, the second criteria [sic] being form. Approximately one acre annually should provide ample product to meet income requirements.” The Plan states that the recommended Stand II cuttings would provide for a harvest of approximately six cords of wood annually. The Plan also recommends that, throughout the ten-year period, the network of roads in the property be maintained annually and that the property be monitored periodically because a portion was being used by teenagers as a party site.
Plaintiffs Form FA-1 for tax year 1999 is dated July 9, 1998. ■ It shows, as the “Annual Harvest of Woodland Products,” six cords of fuelwood. The accompanying Form WD-1 shows “Products Harvested” of six cords and income received or anticipated of $540. The form also indicates that the “[Woodland Management] Plan previously filed continues to be followed.” The Stand Map shows an area colored yellow and described as “Area of 1997 cutting-6 CDs — $540.00.” The area is located approximately one-third in Stand IV and approximately two-thirds in Stand II.
The Form FA-1 filed for tax year 2000 is dated July 14, 1999. It shows, as the “Annual Harvest of Woodland Products,” six cords of fuelwood. The Form WD-1 shows “Products Harvested” of six cords of wood and income received or anticipated of $630. The form also describes the following “other activities”: “All *174 property lines posted January 1999, marking for 1999 cutting done January 1999.” As with the form filed for 1999, the 2000 Form WD-1 confirms that the plan previously filed “continues to be followed.” The Stand Map shows property lines posted, an “Area Marked For 1999 cutting” located within Stand IV, and an “Area of 1998 cutting 6 CDs” wholly within Stand II.
The Form FA-1 filed for tax year 2001 shows, as the “Annual Harvest of Woodland Products,” five cords of fuelwood. The Form WD-1 shows “Products Harvested” of five cords of wood and income received or anticipated of $550. The form also describes the following “other activities”: “Firewood marked and sold, to be cut Fall 2000, additional wood to be marked Fall 2000, posted signs replaced as necessary.” The Stand Map indicates in orange an area totally within Stand IV described as “Area marked Feb 1999, and sold, to be cut 9/00. Income $550.00.”
Between September 6, 1997 and October 24, 2001, defendant’s tax assessor made nineteen inspections of the subject twenty-five acres. He testified that, although he observed trees marked for cutting on April 9, 1999, he saw no evidence of cutting until an inspection in December 2000. Plaintiffs forester testified that the cutting shown on the Stand Maps for 1997 and 1998 actually took place during those years. Plaintiff acknowledges, however, that the trees marked for cutting in 1999, and scheduled to be cut in 1999, were not cut until November 2000 because the person who agreed to cut and purchase the wood regarded market conditions for resale to be unfavorable in 1999. Plaintiff received payment for the postponed cutting in April 1999. The cutting described in the 2000 application as scheduled for the Fall of that year took place in November or December 2000. At the same time, a cutting of wood for tax year 2001 also took place. Plaintiff received payment for the 2000 and 2001 cuttings in November 2000.
II.
In order to qualify for farmland assessment as woodlands, land must comply with the general requirements of the Farmland Assessment Act, N.J.S.A 54:4-23.1 to -23.23 (the “Act”), and with *175 the specific requirements of the Act relating to woodlands. Estell Manor City v. Stern, 14 N.J.Tax 394, 415 (Tax 1995). Among the Act’s general requirements applicable to all agricultural or horticultural land is that the land be “actively devoted to agricultural or horticultural use” and be “so devoted for at least the 2 successive years immediately preceding the tax year in issue.” N.J.S.A. 54:4-23.2. The Act imposes other requirements relating to the size of the land, the filing of the farmland assessment application, and the income required. Defendant does not dispute that plaintiff satisfied these requirements (subject to the dispute described and resolved above relating to whether a stand map was included with the application for tax year 1999).
The specific requirements of the Act relating to woodland management are contained in N.J.S.A. 54:4-23.3, which sets forth several “additional conditions” for woodland to qualify for farmland assessment. The first is that the “landowner establishes and complies with the provisions of a woodland management plan” prepared by an approved forester in accordance with the guidelines specified in the statute. N.J.S.A. 54:4-23.3(a). The second is that the forester and landowner annually attest to compliance with the plan. N.J.S.A. 54:4-23.3(b). The third additional condition is annual submission of an application accompanied by “a supplementary woodland data form setting forth woodland management actions taken in the pre-tax year, the type and quantity of tree and forest products sold, and the amount of income received or anticipated for same; a map of the land showing the location of the activity and the soil group classes of the land; and other pertinent information required by the Director of the Division of Taxation .... ” N.J.S.A. 54:4-23.3(c) (emphasis added).
The regulations promulgated by the Director of the Division of Taxation define the pre-tax year as “the calendar year immediately preceding the ‘tax year’.” N.J.A.C. 18:15-1.1. The tax year is defined as “the calendar year in which the local property tax is due and payable.” Ibid. N.J.S.A 54:4-23.6(c) requires that the annual application be submitted to the assessor “on or before August 1 of the year immediately preceding the tax year.” The *176 regulations define the filing date as “on or before August 1 of the pre-tax year.” N.J.A.C. 18:15-2.4. The regulations also reiterate the additional requirements applicable to woodland. N.J.A.C. 18:15-2.7. Among these requirements is the submission of a woodland data form which describes “all woodland management actions taken in the pre-tax year.” N.J.A.C. 18:15-2.7(a)3i.
I interpret the Act and regulations to require that an application for farmland assessment and the accompanying woodland data form describe the woodland management activities which took place during the year in which the application is filed, that is, the pre-tax year. For example, an application for tax year 1999 filed by August 1, 1998 (N.J.S.A. 54:4-23.13) should reflect woodland management activities during 1998. In order to qualify for farmland assessment, those activities must be in compliance with the approved woodland management plan, unless the plan is replaced or revised. As contemplated by the woodland data form, a new plan or revisions to a plan may be filed with the Form.
In addition to the requirements of the statutes relating to qualification for farmland assessment, certain general principles of law apply to farmland assessment applications. Thus, the assessment on the property enjoys a presumption of correctness, and the burden of proving that land qualifies for farmland assessment is on the taxpayer. Miele v. Jackson Tp., 11 N.J.Tax 97, 99 (App.Div.1989).
Statutes granting preferential tax treatment, of any nature, must be strictly construed against the taxpayer seeking such preferential treatment because they provide benefits at the expense of all the remaining taxpayers in the municipality. The burden of proof in a tax exemption case is always on the party claiming exemption. “[T]he Farmland Assessment Act is akin to tax exemption statutes which must be strictly construed against the party claiming the tax exemption,
[Estell Manor City, supra, 14 N.J.Tax at 417 (citations omitted).]
For tax year 1999, plaintiffs application, as described above, included a Stand Map which showed an area of cutting in 1997. Nothing attached to the application indicates that any cutting or other activity contemplated by plaintiffs Plan took place during the pre-tax year, that is, 1998. Accordingly, the application does *177 not indicate compliance with the Plan as required by statute and regulations. In addition, the Stand Map indicates that approximately two-thirds of the 1997 cutting took place in Stand II. The Plan indicates that, for tax year 1997, cutting was to take place in Stand IV. If I accept the testimony of plaintiffs forester that cutting occurred in 1998, the Stand Map submitted with the application for tax year 2000 showed the cutting to be entirely in Stand II, not in Stand IV as provided in the Plan. This cutting, therefore, was not in compliance with the Plan. Thus the statement in the 1999 WD-1 Form that the “[p]lan previously filed continues to be followed” was incorrect.
The tax assessor is entitled to rely on a farmland assessment application as demonstrating whether the taxpayer has complied with the requirements of a woodland management plan, and as a basis for determining when and whei'e to make an inspection in order to verily compliance with the plan. Specifically, the assessor is entitled to rely on information contained in the application as to when and where cutting took place, so that, if the assessor elects to inspect the land, the assessor can readily verify whether or not the claimed cutting and woodland management practices actually occurred.
The accuracy and reliability of the annual application documents is impox*tant not only for the assessor but also for the Commissioner of the Department of Envii’onmental Protection. Under N.J.S.A. 54:4-23.3(e), a copy of the annual application based on woodland management must be submitted to the Commissioner. The Commissioner must x'eview the application and, by October 31, advise the assessor as to whether the application complies with a pi-operly prepared woodland management plan. N.J.S.A. 54:4-23.3a(b) and (e); N.J.A.C. 18:15-2.12(a). In addition, the Commissioner is inquired to inspect the property at least once every three years. N.J.S.A. 54:4-23.3a(b); N.J.A.C. 18:15-2.13.
This court has previously held that a taxpayer is bound by the contents of a farmland assessment application. In Interstate 78 Office Park, Ltd. v. Tewksbury Tp., 11 N.J.Tax 172 (Tax 1990), the taxpayer submitted a farmland assessment application based on *178 harvesting of cropland and then contended that farmland assessment should be granted based on the raising of horses for sale. In rejecting the taxpayer’s contentions, the Tax Court stated as follows:
The farmland application is a necessary factual document without which an assessor cannot make an informed determination whether to grant or deny the application as required by the Legislature. In reaching his determination an assessor is entitled to rely on the claims and data contained therein. To conclude otherwise would make the farmland application a sham rendering it ineffectual and meaningless; it would completely thwart the Legislature’s scheme of controlling the granting of farmland assessments as evidenced by the act’s requiring the filing of the application and its approval or disapproval in the pretax year.
[Id. at 185.]
In denying farmland assessment under circumstances where the crop described in the farmland assessment application was not the crop actually grown on the property, the Tax Court held as follows in Wishnick v. Upper Freehold Tp., 15 N.J.Tax 597 (Tax 1996):
Under the [Farmland Assessment] Act, the assessor has only a limited three month period within which to review all farmland assessment applications. The farmland assessment application is specifically designed to reduce the time, effort, and expense required by municipal assessors to determine farmland qualification claims during that limited period for review.
If, as plaintiffs claim occurred in this case, a taxpayer decides to change the qualifying crop specified on the application in the period following the application’s submission, the taxpayer should bear the minimal burden of notifying the assessor of the change. This would allow the assessor to make an inspection at the appropriate time and would give the assessor a fair opportunity to accumulate evidence in the event the assessor is later required to defend a decision to deny qualification for the property.
[Id. at 605-606.]
Based on these descriptions of the significance and function of the farmland assessment application, I conclude that plaintiffs 1999 application for farmland assessment was properly denied because the application failed to demonstrate woodland management activity on the subject property during the pre-tax year, that is, 1998, in compliance with the Plan and because no woodland management activity in compliance with the Plan took place on the property. Cutting in 1997 is not a basis for farmland assessment in 1999. Even if cutting in 1998 is considered, the cutting was in a stand different from that designated by the Plan.
*179 In denying qualification for farmland assessment for 1999, I do not accept or rely on the contention of the municipality that the subject property was not actively devoted to woodland management activities during 1997 and 1998 (based on woodland management activities during 1996 and 1997, respectively). Tax appeals filed for those years were settled by the municipality and, as part of the settlement, the municipality agreed to farmland assessment on the subject properties. The settlement, therefore, reflects an acknowledgment by the assessor and the municipality that the property was actively devoted to woodland management for those two years.
With respect to tax year 2000, the Stand Map included with plaintiffs application showed property lines posted, an area marked for 1999 cutting, and an area of cutting in 1998 wholly within Stand II. The application does not indicate compliance with the woodland management plan during the pre-tax year, 1999, when six cords of wood were to be cut from Stand IV. Cutting in 1998, even if in the stand designated by the Plan, does not satisfy the requirements of the Act for woodland activity in the pre-tax year. As discussed above, the 1999 cutting was deferred until 2000 because of market conditions. This is an insufficient reason to justify plaintiffs failure to comply with the Plan which plaintiff represented “continued to be followed.” The deferral may have been permissible if plaintiff had notified the assessor and the Commissioner of the Department of Environmental Protection. Plaintiff failed to do so, and, consequently, plaintiffs property was not actively devoted to woodland management for tax year 2000. I note that the FA-1 Form and WD-1 Form filed by plaintiff for 2000 stated that, during the pre-tax year, six cords of wood had been harvested. These statements were inaccurate and could have been corrected by timely notice to the assessor.
As discussed above, wood cutting for tax years 1999, 2000, and 2001 occurred in November or December 2000. That cutting was in Stand IV as required by the Plan. Thus, the application forms and activities on the subject property during 2000, the pre-tax year for the 2001 application, were in compliance with the Plan. *180 However, because the property did not satisfy the statutory requirements for active devotion to woodland management during 1999 and 2000, the property cannot qualify for farmland assessment in 2001.
III.
Plaintiffs applications for farmland assessment for tax years 1999 and 2000 were deficient because each failed to show woodland management activity during the applicable pre-tax year in accordance with plaintiffs woodland management plan. In addition, the actual activity on the property during 1998 and 1999 did not comply with the Plan because cutting occurred in a tree stand not contemplated by the plan (in 1998) or the cutting contemplated by the plan did not occur at all (in 1999). The taxpayer did not notify the assessor or the Commissioner of the Department of Environmental Protection of the deviations from the Plan, either in the application documents or otherwise. To the contrary, the WD-1 Form filed for 1999 and 2000 incorrectly and improperly stated: “Plan previously filed continues to be followed.” Under all of these circumstances, defendant’s tax assessor properly denied farmland assessment for 1999 and 2000. Because no cutting in compliance with the Plan took place in 1998 or 1999, plaintiffs property was not actively devoted to woodland activity for 1999 and 2000. In the absence of such active devotion for both 1999 and 2000, the property did not qualify for farmland assessment in 2001.
Judgments will be entered affirming the 1999, 2000, and 2001 assessments on plaintiffs property.

The disallowance notices for tax years 1999 and 2000 are dated January 2, 1999 and January 3, 2000, respectively, approximately two months after the November 1 deadline for disallowances established by NJ.S.A. 54:4-23.13b. Plaintiff did not establish any prejudice from the late notices, and, therefore, the lateness is not a factor in determining whether plaintiff's land should be granted farmland assessment. Franklin Estates, Inc. v. Edison Tp., 142 N.J.Super. 179, 184-85, 361 A.2d 53 (App.Div.1976), aff'd o.b., 73 N.J. 462, 375 A.2d 658 (1977).